UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

---

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.                                 Case No.

CERTAIN REAL PROPERTY
commonly known as
5500 (TO INCLUDE 5510) WEST FLORIST
AVENUE, MILWAUKEE, WISCONSIN,

                    Defendant.

---

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE IN REM**

---

      The United States of America, by its attorneys, Matthew D. Krueger, United States

Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United States

Attorney for this district, alleges as follows:

      1.      This is a civil action *in rem* brought to enforce the provisions of Title 18, United

States Code, Section 981(a)(1)(A), which provides for the forfeiture of property that was

involved in a conspiracy to engage in concealment money laundering, as well as concealment

money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h) and

1956(a)(1)(B)(i), respectively.

      2.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355.

      3.      Venue is proper in this district under 28 U.S.C. § 1355(b)(1), because the acts or

omissions giving rise to the forfeiture occurred in this district.

4. The defendant is a parcel of real property located at 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, with all improvements, appurtenances, and attachments thereon, being further described as follows:

That part of the Northwest ¼ of Section 26, Town 8 North, Range 21 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin, bounded and described as follows:

Commencing at the Southwest corner of said ¼ Section; thence North 1° 04' West along the West line of said ¼ Section, 50.00 feet to its intersection with the Westerly extension of the North line of West Florist Avenue; thence North 88° 25' East along the North line of said West Florist Avenue and its Westerly extension, 1057.00 feet to the point of beginning of the land to be described; thence continuing North 88° 25'East along the North line of said West Florist Avenue, 210.34 feet to a point in the West line of North 55th Street; thence North 0° 49' 44" West along the West line of said North 55th Street, 342.53 feet to a point; thence South 88° 25' West on a line parallel to the North line of said West Florist Avenue, 214.85 feet to a point; thence South 1° 35' East on a line at right angles to the North line of said West Florist Avenue 342.50 feet to the place of beginning.

Parcel ID Number:  156-9996-149-0

5. As of June 9, 2000, the defendant real property located at 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, was titled to Sonag I, LLC.

6. The facts and circumstances supporting the forfeiture of the defendant real property are contained in the affidavit of Jennifer M. Walkowski, which is attached hereto as Exhibit A and is fully incorporated herein by reference.

7. The defendant real property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, with all improvements, appurtenances, and attachments thereon, is property that was involved in a conspiracy to engage in concealment money laundering, as well as concealment money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i), respectively, and is therefore subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(A).

2

WHEREFORE, the United States of America prays that notice of the complaint for civil forfeiture *in rem* be posted upon the defendant real property located at 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, in an open and visible manner in order to make the government's action open and notorious; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment declare the defendant real property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

Dated at Milwaukee, Wisconsin, this 3rd day of April, 2018.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:

s/SCOTT J. CAMPBELL
SCOTT J. CAMPBELL
Assistant United States Attorney
Scott J. Campbell Bar Number: 1017721
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: scott.campbell@usdoj.gov

3

*Exhibit A*

**AFFIDAVIT IN SUPPORT OF A VERIFIED COMPLAINT FOR CIVIL FORFEITURE
*IN REM* OF CERTAIN REAL PROPERTY COMMONLY KNOWN AS
5500 (TO INCLUDE 5510) WEST FLORIST AVENUE, MILWAUKEE, WISCONSIN**

I, Jennifer M. Walkowski, being first duly sworn on oath, do hereby depose and say:

**Introduction**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) of the United States Department of Justice.  I have been so employed with the FBI since November 2, 2003.

2.      Since entering on duty with the FBI, I have investigated criminal violations, including but not limited to bank robbery, Hobbs Act violations, theft of government property, wire fraud, mail fraud, mortgage fraud, health care fraud, corporate fraud, civil rights violations, public corruption and money laundering.   In my capacity as an FBI Special Agent, I am charged with investigating these and other criminal violations, including the violations pertaining to the matter described in this affidavit, more specifically described as violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), and 1956 (money laundering).

3.      All the information contained in this affidavit is based on my personal knowledge, my review of documents and other records obtained in the course of this investigation, information I have obtained in the course of this investigation from witnesses having personal knowledge of the events and circumstances described herein, and from other law enforcement officers involved in this investigation, all of whom I believe to be truthful and reliable.  I have not included in this affidavit every detail I know about this investigation.

4.      I submit this affidavit in support of a Verified Complaint for Civil Forfeiture *in rem* against certain real property commonly known as 5500 (to include 5510) West Florist

Avenue, Milwaukee, Wisconsin, with all improvements, appurtenances, and attachments thereon (hereinafter referred to as the "Florist Avenue Property").

5. Based upon information I believe to be truthful and reliable, I submit that the Florist Avenue Property was involved in a conspiracy to engage in concealment money laundering, as well as concealment money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i), respectively. I further submit that the Florist Avenue Property is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

**Record Owner of 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin**

6. The real property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, is titled in the name of Sonag I, LLC.

## Background

7. Agents from Defense Criminal Investigative Service, the Department of Veterans Affairs ("VA") Office of Inspector General, the U.S. General Services Administration ("GSA") Office of Inspector General, the FBI, the U.S. Small Business Administration ("SBA") Office of Inspector General, and Department of Army Criminal Investigation Command ("Army CIC") have investigated a suspected conspiracy to commit crimes involving two federal programs that set aside government contracts for certain disadvantaged groups. The first program is the Small Business Act Section 8(a) Program ("8(a) Program"), established by 15 U.S.C. § 632w and 15 U.S.C. § 15(d), which helps small companies owned and operated by socially and economically disadvantaged persons. The second program is the Service Disabled Veteran Owned Small Business ("SDVOSB") program, established by the Veterans Entrepreneurship and Small Business Development Act of 1999 (15 U.S.C. § 657b) and the Veterans Benefits Act of 2003 (15 U.S.C. § 657f), which helps small businesses owned by service-disabled veterans.

2

**SBA 8(a) Business Development Program**

8.      The SBA's 8(a) Business Development Program is intended to help small businesses owned and controlled by socially and economically disadvantaged individuals gain a foothold in government contracting.  The SBA certifies qualified small businesses under the 8(a) Program.  Certified 8(a) firms can compete for government contracts that are set aside for 8(a) firms.  See 13 C.F.R. §§ 124.101 *et seq.*

9.      The requirements to become certified under the 8(a) Program include the following:

> A.      The business must be majority-owned (51 percent or more) by one or more socially and economically disadvantaged individuals;
>
> B.      The business must be controlled and managed on a full-time, day-to-day basis by one or more disadvantaged individuals who possess the required management capabilities;
>
> C.      The business must be small, as measured by the SBA's criteria for small businesses;
>
> D.      The business must demonstrate potential for success, which usually means having at least two years of performance history;
>
> E.      The disadvantaged individuals owning and controlling the business must show good character; and
>
> F.      If any non-disadvantaged individuals are involved in management of the firm, they must not (i) have the power to control the firm, (ii) be a former employer or principal of a former employer of the disadvantaged individual (unless the SBA expressly approves of the relationship); or (iii) receive more compensation than the highest disadvantaged officer.

10.      To become certified under the 8(a) Program, an applicant must submit SBA Form 1010 to the SBA.  For continued eligibility in the SBA 8(a) program, a company is required to submit SBA forms 1450 (8(a) Annual Update) and 413 (Personal Financial Statement) on an annual basis.  Forms 1010 and 413 include warnings indicating that providing

3

any false information or making any misrepresentations subjects the submitting party to prosecution under 15 U.S.C. § 645 and/or 18 U.S.C. § 1001. SBA relies upon 8(a) applicants to supply truthful information on all forms submitted as part of the application and continued-eligibility processes.

11.     8(a) firms can receive set-aside and sole-source contracts and are also able to form joint ventures to bid on and perform larger prime contracts. All joint ventures must be reported to the contracting agency and the joint venture must still meet the requirements for small business size and control.

12.     Participation in the program is divided into two phases over nine years: a four-year developmental stage and a five-year transition stage. Once a firm graduates from or voluntarily withdraws from the program, it is prohibited from future participation.

**Service-Disabled Veteran-Owned Small Business Program**

13.     The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of awarding not less than three percent of the total value of all prime contract and subcontract awards to small business concerns owned and controlled by service-disabled veterans. The Veterans Benefits Act of 2003 established a procurement program for Service Disabled Veteran Owned Small Businesses ("SDVOSBs"). This procurement program provides that federal contracting officers may restrict competition to SDVOSBs and award a sole-source or set-aside contract where certain criteria are met.

14.     To be eligible for the SDVOSB program, the SDVOSB must meet the following criteria:

> A.     The veteran-owner(s) must have a service-connected disability rating that has been determined by the VA or Department of Defense;

4

B.    The veteran-owner(s) must unconditionally own at least 51% of the SDVOSB and ownership must be direct;

C.    The veteran-owner(s) must be the highest compensated employee of the SDVOSB unless there is logical explanation, submitted by the veteran, as to why taking a lower salary than other employee(s) benefits the business;

D.    The veteran-owner(s) must control the day-to-day management, daily operations, and long-term decision making of the SDVOSB;

E.    The veteran-owner(s) must hold the highest officer position in the SDVOSB and control the board of directors, if applicable;

F.    The veteran-owner(s) must have the managerial and industry experience of an extent and complexity needed to manage the company; and

G.    The SDVOSB must be small under the NAICS code assigned to the industry in which the SDVOSB purports to be classified (*i.e.*, Industrial Building Construction, Commercial and Institutional Building Construction).

15.    If a business fails to meet any one of these criteria, it cannot be verified by the VA as a SDVOSB and cannot bid on any government contracts, for any government agency, that are set aside under the SDVOSB program.

16.    All owners of the applicant business must submit individual VA Form 0877 as a part of the application.  This form includes an admonition that the making of a false, fictitious, or fraudulent certification may render the maker subject to prosecution under 18 U.S.C. § 1001.

17.    During the initial phase of the SDVOSB procurement program, owners of applicant businesses were required to self-certify through government databases that they met the criteria to be eligible to participate in the SDVOSB program.  However, beginning in 2011, the VA's Center for Verification and Evaluation ("CVE") began a new verification process that requires applicants to submit materials online.  The CVE relies on the truthfulness and accuracy of the documents and statements made by the business owners to determine eligibility for the program.

5

18.     Beginning in 2011, VA contracts awarded under the SDVOSB set-aside program required businesses to be CVE-verified and listed in the VA's Vendor Information Page website. Other government agencies awarding contracts to SDVOSBs still rely primarily on self-certifications in government databases.  Initially, CVE verifications were valid for one year and the concern had to re-apply to have their SDVOSB status renewed.  Effective June 27, 2012, CVE verification is valid for two years and then must be renewed.

**Government Databases**

19.     Any business seeking a contract or purchase agreement with the federal government must first register, online, in government-operated databases.  These databases are under the authority of the GSA.  Before July 2012, prospective contractors were required to register in the Central Contractor Registration ("CCR"), and complete the Online Representations and Certifications Application ("ORCA") prior to being awarded a contract.  In July 2012, the CCR and ORCA were combined into the System for Award Management ("SAM").

20.     The business must self-certify that it meets the specific requirements related to their status-based assertions, annually or any time there is a substantive change in the accuracy of previous certifications.  Each status-based business classification is fully defined with references and hyperlinks to the laws that govern the programs.  All entries in these databases are made with the admonition of possible penalties under 18 U.S.C. § 1001.  Contracting officials for the VA, Department of Defense ("DoD"), and other government agencies rely upon these certifications prior to awarding set-aside contracts.

6

**Facts Supporting Findings that the Defendant Florist Avenue Property Facilitated, and was Therefore "Involved In," a Conspiracy to Commit Concealment Money Laundering and Financial Transactions that Constituted Concealment Money Laundering**

**Summary of the set-aside contract fraud scheme involving, among others, Nuvo and C3T**

21.     As detailed below, I submit that Brian Ganos ("Ganos"), the President and majority shareholder of Sonag Company, Inc.,[1] and Vice President and minority shareholder of Nuvo Construction Company, Inc. ("Nuvo"), with the assistance of other individuals and their affiliated companies, violated federal law by pursuing a scheme to seek and obtain government set-aside contracts for which they were not eligible.

22.     Brian Ganos became the owner and president of Sonag Company, Inc. ("Sonag") in 1992.  Ganos, as an Hispanic male, qualified as a disadvantaged individual for the 8(a) Program.  In 1994, Sonag was granted 8(a) status and became eligible to receive set-aside contracts.  In May 2003, Sonag successfully graduated from the program and could no longer bid on 8(a) set-aside contracts.  From approximately 1995 until 2008, an individual having the initials "J.H." was a Project Manager for Sonag.

23.     Brian Ganos, with assistance from J.H., pursued a scheme to defraud the United States by obtaining 8(a) and SDVOSB set-aside government contracts for which they were not entitled.  They did so by identifying a former Sonag employee, J.L., and a former C3T employee, O.M., as persons who qualified as disadvantaged individuals, and directing them to become the purported owners of Nuvo and Pagasa, respectively.  Once established, both Nuvo and Pagasa successfully applied to the SBA 8(a) program.  In addition, Ganos and J.H. identified an individual having the initials "T.A.," who met the requirements of a Service Disabled Veteran, to become the purported owner of C3T and qualified to receive SDVOSB set-aside contracts.  In

---

[1] Sonag is Ganos spelled backward.

reality, however, Ganos and J.H. controlled Nuvo, Pagasa, and C3T, which allowed Ganos and J.H. to financially benefit from contracts that Sonag was not eligible to receive.

24.     A former Sonag employee, L.M., was the contract accountant for Sonag, C3T, Nuvo, and Pagasa.  L.M. performed banking and financial transactions to facilitate the movement of large amounts of money between these companies.

25.     As detailed below, Sonag, Nuvo, C3T, and Pagasa were all co-located in the same building located on the northwest corner of W. Florist Avenue and N. 55th Street in Milwaukee, Wisconsin, which is the Defendant Florist Avenue Property.

26.      Due to the fraudulent creation, management, and affiliation of these companies, Ganos, with assistance from J.H., received 8(a) set-aside federal contracts valued at approximately $60 million and SDVOSB set-aside contracts valued at approximately $192 million.

27.     Brian Ganos used funds obtained from the government set-aside contracts to financially benefit companies he initiated, solely or jointly.  Companies known to be affiliated with Ganos include Trinity Marketing Services, Sonag Ready Mix, Sonag Electrical, LJ Properties, Jax Properties, MC Properties, Eagle Properties, ARS Properties, LLC, and Grand C Trucking, hereafter referred to as "affiliated companies."

**Summary of How the Defendant Florist Avenue Property Facilitated the Concealment Laundering of Proceeds of the Set-Aside Contract Fraud Scheme**

28.     Brian Ganos and others used the Defendant Florist Avenue Property to facilitate the laundering of proceeds of the 8(a) and SDVOSB set-aside fraud scheme and to facilitate a conspiracy to engage in such concealment laundering.  Specifically, Brian Ganos and co-conspirators used Nuvo and C3T to make payments of funds, which included proceeds of the fraud scheme, and which payments were disguised as payments of rent for Nuvo's and C3T's

8

occupancy of the Defendant Florist Avenue Property. These ostensible rental payments amply exceeded the amounts of rent that Nuvo and C3T were contractually required to pay Sonag I, the owner of the Defendant Florist Avenue Property, and which company is controlled by Ganos. Ganos and his co-conspirators caused Nuvo and C3T to make these "excess" rental payments to Sonag I for the purpose of transferring fraud proceeds from accounts in the names of Nuvo and C3T to accounts at companies that Ganos controlled, including Sonag Company and Sonag I, for the seemingly legitimate purpose of paying rent. These excess rental payments were designed to conceal that they were funded by fraud proceeds that Nuvo and C3T had received via fraudulently obtained set-aside contracts; how Ganos and conspirators in fact controlled those fraud proceeds; and the ultimate location of criminal proceeds.

29.     Simply put, the Defendant Florist Avenue Property facilitated this excess-rent-payment money laundering conspiracy, and the underlying excess-rent-payment money laundering transactions, by providing a pretense for, and lending an air of legitimacy to, these money laundering transactions. That was so because both Nuvo and C3T did in fact lease office space at that property and both were contractually obligated to pay some rent under their leases with the nominal building owner, Sonag I. But the amount of the lease payments that Nuvo and C3T made to Sonag I, as reflected on the general ledgers of Nuvo, C3T, and Sonag I, vastly exceeded the actual amounts of monthly rent that Nuvo and C3T would have been contractually required to pay Sonag I, even under the most generous estimate of those contractually required monthly rental amounts.

**Nuvo Construction Company, Inc.'s Formation and Operation**

30.     In 2014, an individual approached law enforcement with information regarding an inappropriate affiliation between Sonag, Nuvo, C3T, and Pagasa. This individual had been

9

employed by Sonag and Nuvo for approximately 14 years, which gave him/her an intimate knowledge of specific contract details, office culture, and financial transactions. This individual is identified as confidential source "CS-1."

31.    CS-1 reported that when Sonag was graduating from the 8(a) Program, Brian Ganos pursued a plan to establish a new company, which would become Nuvo, and place a minority individual in the position of company president so that Nuvo could obtain 8(a) classification and bid on 8(a) set-aside contracts. CS-1 explained that Ganos approached a Sonag employee, J.L., with the offer to become president of Nuvo. J.L. had five years of construction management experience with La Casa Construction Company and was a project manager for Sonag. According to CS-1, at the time Ganos offered J.L. the position, J.L. was experiencing personal financial hardship and may have been on the verge of losing J.L.'s residence. Therefore, J.L. agreed to become president.

32.    Wisconsin DFI records show that in March 2001, J.L. changed the name of Insulation Masters, Inc., a company J.L. had incorporated, to Nuvo. According to Nuvo records submitted to SBA, Brian Ganos became 15% minority owner of Nuvo in April 2001.

33.    On June 9, 2004, J.L. submitted Nuvo's initial SBA 8(a) program application on SBA Form 1010. It stated that J.L. was the president of Nuvo, that J.L. had 85% ownership interest in Nuvo, and that "100% of [J.L.'s] hours were devoted to the management of the firm." The form listed Brian Ganos as the V.P./Secretary and stated that Ganos had only a 15% ownership interest.

34.    Based on these statements and submitted records, SBA granted Nuvo 8(a) status on September 23, 2004. Nuvo then submitted a business plan to the SBA in October 2004, which upon the SBA's approval, allowed Nuvo to bid on 8(a) set-aside contracts. The business

10

plan again listed J.L. as the president, 85% owner, and full-time manager of the company with an annual salary of $48,000 per year, and listed Brian Ganos as a 15% owner receiving no annual salary at all.

35.     As part of Nuvo's participation in the SBA 8(a) program, J.L. was required to submit an annual report to the SBA with updated records to demonstrate Nuvo's continued compliance with the 8(a) requirements. J.L. complied with this requirement and purportedly signed Nuvo's annual review forms from September 2005 through October 2012. In these annual reports, J.L. continued to assert that J.L. was the president of Nuvo, that J.L. was the 85% owner of Nuvo, and that J.L. conducted and managed Nuvo's daily business operations, as required by the 8(a) Program. These annual reports also asserted that J.L. was drawing a substantial salary and that Brian Ganos was only a 15% owner and not drawing any salary.

36.     Accompanying some of J.L.'s SBA annual reporting records were copies of J.L.'s IRS Tax Return, Form 1040. These returns show Nuvo as J.L.'s sole source of income. They do not show J.L. as receiving income from any other employment besides Nuvo.

37.     CS-1 reported that J.H., not J.L., actually managed Nuvo. CS-1 also explained that once Nuvo began working on government set-aside contracts, Sonag Construction's business slowed down drastically because the majority of Sonag's personnel began working on Nuvo projects. In addition, CS-1 reported that Brian Ganos provided the financial backing for Nuvo.

38.     Nuvo's office is located in an office suite next to Sonag's suite in a single-story office complex owned by Sonag I, LLC, a company owned by Brian Ganos. This office complex is located at the Florist Avenue Property. Nuvo pays Sonag I monthly rent for Nuvo's use of the office suite and warehouse area in the office complex.

11

39. CS-1 reported that shortly after Nuvo was granted 8(a) status in 2004, J.L. moved to Worthington, Minnesota, with J.L.'s family, and has had only limited involvement with Nuvo.

40. The investigation has corroborated that J.L. lived in Minnesota and worked for another employer in Minnesota during the period when J.L. purported to be the day-to-day manager of Nuvo.

41. J.L.'s Tax Return, IRS Form 1040, for 2004, revealed that J.L. and J.L.'s family had moved from Wisconsin to 1XXX 5th Avenue in Worthington, Minnesota in July 2004. J.L.'s Tax Returns from 2007, 2009, and 2010 indicate J.L. resided at 32XXX 210th Street in Worthington, Minnesota.

42. According to the Minnesota Department for Public Safety, J.L. obtained a Minnesota Driver's License on November 20, 2006, which was renewed on November 17, 2010, and again in November 25, 2014. On J.L.'s original Minnesota Driver's License application, dated November 20, 2006, and on subsequent renewal applications, J.L. reported J.L.'s home address was 32XXX 210th St, Worthington, Minnesota.

43. Internet searches show that J.L. has been employed in Minnesota by the Southwest Minnesota Housing Partnership ("SWMHP"), located at 2401 Broadway Ave, Suite 4, Slayton, Minnesota, during the same time period J.L. purported to manage Nuvo full time. SWMHP's LinkedIn page states that it is a "non-profit green developer with over 20 years of experience in developing and preserving affordable housing in Minnesota." SWMHP maintains a website at www.swmhp.org. A review of the SWMHP website revealed two staff rosters. One roster dated April 2, 2009, identified J.L. as the Senior Project Manager in the Construction Division. The second roster, dated July 2014, identified J.L. as the Director of Construction Services. The website also provided a group picture of the staff with a list of the names of the

12

individuals pictured.  A comparison between the SWMHP picture identified as J.L. and the image of J.L. on J.L.'s Minnesota driver's license is a match.  Also contained in the SWMHP website was a group image of the staff, which included an image of J.L., titled "Southwest Minnesota Housing Partnership 1992-2008."

44.     Documents obtained by SWMHP corroborate that J.L. planned to work full-time for SWMHP in Minnesota even before submitting Nuvo's initial SBA 8(a) program application on June 9, 2004.  Specifically, on June 7, 2004, J.L. accepted an offer of employment as a Senior Project Manager with SWMHP.  The employment documents reflect that this was a full-time permanent position with full benefits including health insurance, retirement fund, and paid time off.  It reflects that J.L. began his employment with the SWMHP on July 12, 2004.

45.      A review of available financial records from Nuvo revealed transactions that indicated J.L. was hiding income that he received from SWMHP by transmitting that income through Nuvo's business checking account.  According to those records, during the first week of every month from January 2008 through March 2014, SWMHP issued a check or checks to Nuvo that totaled approximately $5,000 to $10,000.  These checks were deposited into Nuvo's checking account.  During this same time frame, Nuvo issued a monthly check to J.L. for a smaller dollar amount than the SWMHP check.

46.     A review of J.L.'s United Prairie Bank accounts revealed J.L. also received weekly direct deposits from Nuvo of approximately $1,500 to $1,800 ($6,000 to $7,200 a month) while Nuvo participated in the 8(a) Program.

47.     As part of Nuvo's annual reports to SBA from 2005 to 2012, J.L. was required to submit a Personal Financial Statement and a Statement of Personal History.  J.L. reported

13

compensation from Nuvo, but in none of those annual reviews did J.L. report compensation from SWMHP.

48.     On those annual submissions, J.L. provided SBA with conflicting information regarding J.L.'s address of residence.  On J.L.'s 2005, 2006, and 2007 reports, J.L. listed J.L.'s residence as 3XXX South 5th Place, in Milwaukee, Wisconsin.  On J.L.'s 2008, 2009, and 2010 reports, J.L. listed J.L.'s residence as S70 W17XXX Muskego Drive, Muskego, Wisconsin.  And on J.L.'s 2011 and 2012 reports, J.L. listed J.L.'s address as 32XXX 210th Street, Worthington, Minnesota.  But on J.L.'s 2012 report, J.L. stated that from August 2003 until July 2007, J.L. lived at 3XXX South 5th Place, in Milwaukee, Wisconsin, and that from July 2007 until October 2012, J.L. lived at 32XXX 210th Street in Worthington, Minnesota.

49.     When interviewed, SBA officials who administer the 8(a) Program in Wisconsin stated that they did not realize that J.L. resided in Minnesota.  They further stated that if they had realized that fact, they would have questioned whether J.L. was actually fulfilling the requirement to be the full-time, day-to-day manager of Nuvo.

50.     CS-1 reported that, from 2004 to the present, J.L. has exercised no control over and rarely visited Nuvo.  Rather, J.L. relied on other employees for information about the day-to-day operation of Nuvo.  However, to create the illusion that J.L. was controlling Nuvo, an office was maintained for J.L. in the building, with personal effects and papers on the desk.

51.     Another former Nuvo employee corroborated CS-1's statements.  This former employee worked at Nuvo from late summer 2013 to early spring 2014.  This former employee stated that J.L. was never at Nuvo, despite having an office there.  The former employee reported seeing awards and plaques with J.L.'s name on them in the Nuvo office.  The former employee believed J.L. was merely a name being used so Nuvo could maintain 8(a) status, because he/she

14

did not know anyone at Nuvo who had met or knew J.L. The former employee heard other employees tell callers that J.L. was not in the office, and those employees would then assist the callers. Nuvo employees did not contact J.L. about the calls, they just handled the business themselves. Based on what he/she heard from fellow employees, and what he/she witnessed while working at Nuvo, the former employee believed that Brian Ganos actually owns the company, not J.L.

52.     CS-1 reported that J.H., not J.L., actually managed Nuvo. Specifically, in February 2012, J.H., Vice President of C3T, fired an individual having the initials "T.B.," a Nuvo Project Manager, for charging personal expenses onto T.B.'s assigned Nuvo company credit card.

53.     CS-1 also reported that Nuvo Project Managers have assigned company-owned vehicles, laptop computers, and cell phones for their use while traveling to and working at contract sites.

54.     CS-1 reported that emails relating to Nuvo business were sent to and from an email address that appeared to belong to J.L., but that was in fact controlled by L.M., the contract accountant for Sonag, C3T, Nuvo, and Pagasa. In corroboration of this statement, CS-1 provided a photocopy of an email sent from an email address purportedly belonging to J.L., XXXXez@Nuvoconstruction.com, on October 10, 2013. The email body consisted of a request from L.M. for information, receipts, and job numbers for the contract attached to the email. That information was to be returned to L.M.

55.     CS-1 recounted that in November 2013, a couple months after Nuvo had graduated from the 8(a) Program, Nuvo employees were issued Sonag email addresses and were instructed to use Sonag email addresses when conducting Sonag business.

15

56.     In corroboration of CS-1 statements, the other former Nuvo employee reported that, from late summer 2013 through early spring 2014, Sonag and Nuvo routinely and inappropriately shared bid information with each other.  The former employee was instructed by individuals having the initials "S.H." and "B.W.," who are Assistant Project Managers for Nuvo, to do things like send bid paperwork from the Sonag fax machine instead of the Nuvo fax machine and pick up bid information from Sonag, even though Sonag was a direct competitor of Nuvo.  According to the former employee, bid day was chaotic, and there was bid information going back and forth between Nuvo and Sonag.  The former Nuvo employee said many Nuvo employees were given duplicate Sonag email addresses.  Sonag and Nuvo also shared computers and printers.

57.     As part owner of Nuvo, Brian Ganos was required to submit SBA 8(a) annual reports to ensure Nuvo's eligibility in the program.  A review of SBA records revealed that Brian Ganos complied with this requirement and mailed in the forms.  Specifically, SBA form 1450, Individual Compensation Worksheet, was submitted indicating, falsely, that from 2008 through 2011, Brian Ganos received no compensation from Nuvo.  Brian Ganos also submitted SBA form 1010, Individual Information, in 2011 and 2012 reporting, falsely, that he did not have authorization to make withdrawals from, or have access to, Nuvo's bank account.  A review of Nuvo's financial records, however, disclosed that, in fact, from March 2009 through August 2009, Nuvo paid Brian Ganos a total of $139,304 and that from December 2011 through August 2016, Brian Ganos was an account holder and authorized signer on Nuvo's financial accounts.

58.     Moreover, documents obtained during the August 2016 and May 2017 executions of search warrants at Nuvo offices indicate that Ganos in fact drew significant amounts of funds from Nuvo for his personal benefit.  For example, documents seized during those searches reflect

16

that Nuvo paid for Ganos' personal insurance expenses, including homeowner's insurance, personal valuables, and vehicle and boat insurance policies. The following are examples of such insurance payments that Nuvo made for Ganos' personal benefit:

A.  On July 3, 2012, check number 12727, in the amount $3,646, was written from Nuvo to Hagerty Insurance Agency for insurance for Ganos' 1956 Chevrolet Bel Air, 1967 Ford Mustang Shelby, and a 1969 Chevrolet Camaro.

B.  On April 1, 2013, check number 13514, in the amount of $1,362, was written from Nuvo to Foremost Insurance Company for Ganos' watercraft insurance.

C.  On July 17, 2013, check number 14002, in the amount of $5,592, was written from Nuvo to Chubb Group Insurance for Ganos' Home and Valuable Articles Insurance.

D.  On July 23, 2014, check number 15351, in the amount of $6,272, was written from Nuvo to Chubb Group Insurance for Ganos' Home and Valuable Articles Insurance.

E.  On July 23, 2014, check number 15355, in the amount of $2,260, was written from Nuvo to Hagerty Insurance Agency for insurance for Ganos' 1967 Ford Mustang Shelby and a 1969 Chevrolet Camaro.

F.  On July 6, 2015, check number 16952, in the amount of $6,330, was written from Nuvo to Chubb Group Insurance for Ganos's Home and Valuable Articles Insurance.

59.  CS-1 reported that Brian Ganos' wife, who has the initials "G.G.," is on Nuvo's payroll but has never actually worked for Nuvo. CS-1 believed that Brian Ganos had his wife added to Nuvo's payroll so he could covertly earn income from Nuvo. A review of G.G.'s IRS form W-2s revealed that from 2009 through 2012, Nuvo paid G.G. approximately $200,000.

60.  A review of property records revealed that on August 31, 2009, Nuvo purchased a residential property at S70 W17XXX Muskego Drive, Muskego, Wisconsin. To facilitate the purchase, Nuvo secured a mortgage from Tri City National Bank in the amount of $392,000. The mortgage was signed by Brian Ganos, Vice President, Nuvo Construction Company, Inc.

17

Contained in the mortgage records was a letter purportedly written by J.L., President of Nuvo Construction Company, giving Brian Ganos full authorization to sign all documents on behalf of Nuvo for the purchase of the property. This letter was endorsed with a stamp of J.L.'s signature. The property purchased by Nuvo at S70 W17XXX Muskego Drive, Muskego, Wisconsin, is adjacent to lakefront property owned by Brian Ganos and where Brian Ganos' permanent residence is located, S71 W17XXX Lake Drive, Muskego, Wisconsin.

61.     Review of property records indicates that Brian Ganos purchased the lakefront portion of the property owned by Nuvo, on April 1, 2011, and consolidated this lakefront property with his personal property at S71 W17XXX Lake Drive, Muskego. According to Waukesha County Register of Deeds records, Brian Ganos paid Nuvo $120,000 for the land. However, a review of Nuvo's BMO Harris bank account statements revealed no evidence of a $120,000 payment received by Nuvo from Brian Ganos or any of Brian Ganos' affiliated companies. The transfer was made via quit claim deed, which was signed by Brian L. Ganos as Vice President for Nuvo.

62.     Additionally, CS-1 reported that Brian Ganos and J.H. have had numerous repairs and additions to their personal residences performed by Sonag, Nuvo, C3T, and outside contractors. CS-1 believed the invoices for the material and labor on these projects were placed on legitimate United States government contracts awarded to Nuvo and C3T.

63.     In support of this statement, CS-1 provided an internal Nuvo accounting document for the September 2010 Department of the Army contract Nuvo was awarded to construct the Renard Island Temporary Causeway in Green Bay, Wisconsin. A review of the document revealed a $50,000 payment, reflected as a cost incurred on the project, to JDJ Builders, Inc., a residential home remodeling company located in Greenfield, Wisconsin.

18

CS-1 reported that JDJ Builders did not perform any work on this contract and the construction of the causeway did not include home remodeling or rough framing.

64.     During this same time period, JDJ Builders filed permits to conduct $250,000 worth of remodel work at Brian Ganos' residence.  A review of Nuvo's financial records revealed that from March 2011 through December 2011, Nuvo wrote seven checks to JDJ Builders for a combined total of approximately $640,000.

**Nuvo's Government Contracts**

65.     A review of the Federal Procurement Database in April 2016 revealed that from 2005 to 2015, Nuvo received a combined total of approximately $60 million in 8(a) set-aside contracts.  The majority of these contracts were awarded by the VA and Department of Defense.

66.      Nuvo made yearly certifications on ORCA, and later through SAM, that it was an SBA 8(a) company.  Available records beginning January 4, 2005, identify that J.L. purportedly made these certifications.  Moreover, available records beginning in September 2011, reveal that J.L. purportedly made these certifications from the IP address of 67.53.131.78. Subscriber records show that this IP address was issued to and paid for by Sonag at the Defendant Florist Avenue Property.  J.L.'s purported last certification was made on July 22, 2015, from IP address 24.167.199.138, which was also issued to and paid for by Sonag at the same Defendant Florist Avenue Property.

67.     VA and Department of Defense contracting officials primarily relied on Nuvo's self-certification submissions to determine Nuvo's eligibility to bid upon and receive contracts. Below are federal government 8(a) set-aside contracts that Nuvo received based upon Nuvo's certifications from August 2011 through March 2016:

19

| Contract ID | Contracting Agency Name | Date Signed to include modifications and task orders | Action Obligation to include mods | ORCA Validated | Purportedly Certified By | Owner IP Address |
|---|---|---|---|---|---|---|
| W911SA10D0002 | ARMY | 10/27/2011-9/26/2013 | $1,022,736.36 | YES | J.L. | Sonag |
| W912J208D0001 | ARMY | 11/22/2011-11/30/2012 | $310,420.37 | YES | J.L. | Sonag |
| W912EK11C0079 | ARMY | 8/9/2011-5/10/2012 | $1,788,373.37 | YES | J.L. | Sonag |
| W911SA12D0008 | ARMY | 8/24/2012-3/3/2016 | $2,117,828.01 | YES | J.L. | Sonag |
| W911SA12D0010 | ARMY | 9/14/2012 - 9/27/2012 | $869,461.62 | YES | J.L. | Sonag |
| W911SA12P0221 | ARMY | 9/27/2012 - 9/26/2015 | $91,908.00 | YES | J.L. | Sonag |
| W911SA12C0013 | ARMY | 09/28/2012 | $356,458.00 | YES | J.L. | Sonag |
| W911SA13D0011 | ARMY | 9/26/2013-3/14/2016 | $1,010,483.31 | YES | J.L. | Sonag |
| | | Total | $7,567,669.04 | | | |

68.    The DoD's Defense Finance and Accounting Service ("DFAS") issues electronic payments to contractors by means of wire to their respective financial accounts and retains a voucher as a record of the payment.  DoD contractors must be registered in the Central Contractor Registration ("CCR") and agree to receive payments electronically.

69.    On September 23, 2013, Nuvo graduated from the program and was thereafter prohibited from bidding on 8(a) set-aside contracts.

**C3T, Inc.'s Formation and Operation**

70.    CS-1 reported that after Nuvo was established, Brian Ganos and J.H. wanted to create a SDVOSB in order to participate in the new SDVOSB government set-aside contract program through the VA.  As a result, in 2006, Brian Ganos and J.H. selected and placed T.A., a

service-disabled veteran, in the position of President of C3T to qualify for the SDVOSB program.

71.     During a CVE site visit in May 2012, Sonag Project Manager J.H. was interviewed. J.H. stated that while J.H. was doing business for Sonag at the VA, J.H. met T.A., who was then working for the VA Facility Management. J.H. stated that J.H. and T.A. decided to start C3T as quickly as possible, by using an established Ganos company, Sonag Masonry, and changing the name to C3T. J.H. and T.A. leased office space from Brian Ganos, through Sonag I, in the Defendant Florist Avenue Property. This office space is adjacent to and in the same Defendant Florist Avenue Property as the offices of Sonag and Nuvo.

72.     During that same CVE site visit, T.A. was interviewed and confirmed that T.A. had met J.H. while attending VA contractor meetings. T.A. stated that T.A. started talking with J.H., and they "ended up doing this." T.A. explained they both saw the advantages in starting a business together to obtain government contracts. T.A. stated that "he went immediately from working for the VA to [J.H.]," and "[J.H.] was a veteran, so [T.A.] felt he could trust [J.H.]."

73.     On April 3, 2006, C3T, Inc. was established and T.A. was listed as 51% owner, while J.H. was listed as 49% owner. According to the Wisconsin Department of Financial Institutions, C3T was originally a Ganos-owned company with various different names. On April 3, 2006, the corporate records were amended to reflect a name change to C3T, Inc. with the registered agent changing from Brian Ganos to J.H. The records state that Brian Ganos transferred, for free, 51% of the company's stock to T.A. as President of C3T, and 49% to J.H. as Vice President of C3T.

74.     After C3T was established in April 2006, J.H. registered C3T as a self-certified SDVOSB in government databases, which allowed C3T to successfully bid on SDVOSB set-aside government contracts.

75.     On July 8, 2008, C3T applied for CVE's verification of the companies' SDVOSB status and inclusion in the verified veteran business database Vendor Information Page.  On August 20, 2008, C3T's SDVOSB status was verified and C3T was added to the database.

76.     On February 24, 2009, CVE sent a letter to C3T requesting clarification as to what, if any, was their relationship with Nuvo and why there were many corporate similarities between C3T and Nuvo, including a common fax number.  On February 26, 2009, T.A. reported, "…there is no relationship between C3T and Nuvo Construction Company, Inc.  C3T, Inc. does not share any ownership, management or control with Nuvo Construction Company, Inc. . . . With the exception of a small amount of labor Nuvo Construction, Inc. provided on one C3T, Inc. project (less than $3,500), we have not subcontracted work to, or received any work from, Nuvo Construction Company, Inc."  However, a review of C3T's financial records revealed that in 2008, C3T received approximately $435,000 from Nuvo.

77.     In January 2010, a former C3T employee was interviewed and reported he/she had worked for C3T for two years, from approximately 2008 through 2010.  The former employee explained that he/she had never met T.A., and that all the other employees considered Brian Ganos and J.H. the bosses of C3T.  The employee reported that C3T was started by Brian Ganos and was operated jointly by Brian Ganos and J.H.  The former employee also stated that tools and equipment that were originally stenciled with Sonag and Nuvo company names were repainted with C3T's company name.

78.     A review of Waukesha County Register of Deeds, financial, and real estate records revealed that on January 4, 2010, C3T purchased a townhome located at W171 S7XXX Lannon Drive, Muskego, Wisconsin, at a bank sale for $150,000.  Three days later, on January 7, 2010, C3T sold the property to individuals having the initials "J.G." and "S.G.," Brian Ganos' son and daughter-in-law, for $130,000.  However, according to the January 8, 2010, Uniform Residential Appraisal Report, the property was valued at $185,000.  Bank documents associated with the sale of the property indicate that the required bank and property documents were signed by J.H., Vice President of C3T.  The sale of this property was finalized on February 22, 2010.  According to mortgage records, Brian Ganos gifted his son and daughter-in-law $22,000 towards the purchase of the property.

79.     In May 2010, T.A. and J.H. completed their respective VA form 0877s, certifying that T.A. was a service-connected disabled veteran and 51% owner and controller of C3T, while J.H., who was a veteran, was 49% owner and controller of C3T.

80.     In September 2010, a non-winning SDVOSB bidder filed a protest with SBA regarding C3T's status as an SDVOSB, alleging an improper affiliation between C3T, Nuvo, and Sonag.  SBA asked T.A. to provide a response.  T.A. stated that C3T subcontracted work to Sonag in 2009 for a combined total of $344,540.  T.A. also reported that "No other company has any control, management, ownership, or interest in C3T.  C3T does not share any ownership, management, control or interest in any business that physically resides in or near the same location as C3T, Inc."  At T.A.'s request, Brian Ganos completed a letter attesting that Ganos "do[es] not own any stock in C3T, Inc., nor has any type of ownership interest, management or control of C3T, Inc."  After reviewing C3T's company records and the statements provided, SBA determined there was no affiliation between the companies and dismissed the protest.  A

23

review of C3T's financial records revealed that C3T actually had paid Sonag $475,000 in 2009, far more than T.A. had stated to SBA.

81.     CS-1 reported that T.A. did not actually run day-to-day operations at C3T, and was not physically present in the building for months at a time.  CS-1 reported that CVE suspended C3T's SDVOSB status for over one year in 2012 due to suspicion that T.A. was not the true owner.  According to CS-1, T.A. then began to come to C3T's office on a regular basis. As soon as C3T was re-verified as a SDVOSB in February 2013, however, T.A. stopped coming to the office.

82.     CVE documents show that it suspended C3T's SDVOSB status on April 2, 2012, because T.A. had failed to submit the required biannual re-verification paperwork.  In May 2012, T.A. submitted C3T company records to become re-verified.  CVE then conducted a site visit and decided not to reinstate C3T's SDVOSB's status.  CVE explained that it was unable to confirm that T.A. was in control of C3T, as T.A. did not have any apparent experience in the construction industry before establishing C3T, while J.H. had 21 years of experience in construction.  T.A. had told the examiner T.A. had "an idea of things in regards to construction, but [J.H.] was the expert."  T.A. also told the examiner that T.A. was learning on the job, relying on L.M.'s expertise in accounting and J.H.'s expertise in construction.  T.A. was unable to answer the examiner's questions regarding payroll and subcontracting, but instead directed the examiner to L.M. and J.H. for the requested information.

83.     During this site visit, the examiner discovered that, according to C3T's 2011 W-2 statements, T.A. earned $85,568 from C3T, while J.H. earned $128,457 from C3T.  According to the program rules, T.A., as president of C3T, was required to be the highest compensated employee of the company.  When the site examiner questioned T.A. on this issue, T.A. reported

that T.A. received an additional $50,000 from C3T in 2011.  T.A. provided CVE with a letter from C3T's CPA reporting that a 1099 was issued to T.A. for $50,000 in 2011 for C3T.  However, a review of both C3T's and T.A.'s financial records revealed no evidence of any transfer of $50,000 to T.A. in 2011, whether by check, cash withdrawal, or electronic money transfer.  In addition, a review of C3T's tax records from 2010 through 2013 revealed no 1099 issued by C3T for $50,000.

84.     A review of Nuvo and C3T bank accounts revealed that both companies transferred money from their checking accounts into a BMO Harris account titled "Sonag Joint PPD" every seven days to cover weekly payroll expenses.

85.     A review of C3T records submitted to CVE revealed that C3T rented office space from Sonag I, LLC, a property management company owned by Brian Ganos.  In July 2012, FBI agents interviewed Brian Ganos as C3T's landlord.  Brian Ganos reported that Ganos has no financial interest or investment in C3T other than as the landlord.

86.     Brian Ganos also reported that Sonag has no business affiliation, no joint ventures, and no mentor relationship with C3T.  Brian Ganos advised that Sonag does occasional subcontracting work for C3T, due to complementary business capabilities.

87.     Contrary to Brian Ganos' claim that Sonag occasionally does subcontracting work for C3T, a review of C3T's financial records revealed that C3T in fact had paid Sonag and Sonag Electric a combined total of approximately $2.7 million between June 2011 and October 2012.  These payments, set forth in the table below, are not rent or utility payments because C3T pays Sonag I rent on a monthly basis.  It is unclear what these payments are for.

25

**Payments from C3T to Sonag**

| Date | Amount | Payment Originated | Payment Received By |
|---|---|---|---|
| 06/14/2011 | $66,000.00 | C3T, Inc. | Sonag Company Inc. |
| 06/15/2011 | $40,000.00 | C3T, Inc. | Sonag Company Inc. |
| 07/07/2011 | $110,000.00 | C3T, Inc. | Sonag Company Inc. |
| 07/29/2011 | $50,000.00 | C3T, Inc. | Sonag Company Inc. |
| 08/31/2011 | $110,000.00 | C3T, Inc. | Sonag Company Inc. |
| 09/30/2011 | $66,000.00 | C3T, Inc. | Sonag Company Inc. |
| 11/02/2011 | $70,000.00 | C3T, Inc. | Sonag Company Inc. |
| 11/10/2011 | $360,000.00 | C3T, Inc. | Sonag Electric * [2] |
| 12/16/2011 | $319,200.00 | C3T, Inc. | Sonag Electric * |
| 12/21/2011 | $48,905.58 | C3T, Inc. | Sonag Electric * |
| 01/09/2012 | $135,000.00 | C3T, Inc. | Sonag Electric * |
| 01/27/2012 | $385,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/01/2012 | $25,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/09/2012 | $140,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/30/2012 | $200,000.00 | C3T, Inc. ** [3] | Sonag Company Inc. |
| 04/17/2012 | $147,844.42 | C3T, Inc. | Sonag Company Inc. |
| 04/30/2012 | $125,000.00 | C3T, Inc. ** | Sonag Company Inc. |
| 06/28/2012 | $204,853.22 | C3T, Inc. | Sonag Electric * |
| 10/18/2012 | $100,000.00 | C3T, Inc. | Sonag Company Inc. |
| **Total:** | **$2,702,803.22** | | |

[2] (*) Checks written to Sonag Electric that were deposited into Sonag Company Inc.'s BMO Harris bank account.
[3] (**) Electronic transfers from C3T's bank account to Sonag Company, Inc.'s BMO Harris bank account.

26

Case 2:18-cv-00519-LA   Filed 04/03/18   Page 26 of 53   Document 1-1

88.     That Brian Ganos and Sonag Co. control C3T and Nuvo is further demonstrated by the fact that Ganos engaged an outside accountant to prepare annual *combined* financial statements for the companies.  In addition, a document prepared by this outside accountant reports that a total of $6,044,119 had been "advanced to Sonag" by C3T from December 15, 2007, through March 31, 2014.  Moreover, between March 2010 and April 2014, six IRS checks totaling $10,970.64 were issued to "C3T and Brian Ganos."  The purpose of these checks is unknown at this time.

89.     In response to CVE's decision to suspend C3T's SDVOSB status, T.A. submitted a request for reconsideration on July 5, 2012.  In the letter, T.A. reported that T.A. alone had founded C3T in 2006, and that he did not hire J.H. until 2008.  On November 2, 2012, C3T's request for reconsideration was denied because T.A.'s statements in the letter contradicted previous statements that T.A. had made to CVE and because T.A.'s statements were in direct conflict with company records that C3T had submitted to CVE reporting that both T.A. and J.H. had founded C3T in March 2006.  CVE determined that T.A. did not provide enough evidence to prove that T.A. controlled C3T.

90.     Further review of the July 2012 reconsideration letter revealed that T.A. reported that it was T.A.'s decision in January 2012 to change the company's 401(k) vehicle from ADP to Transamerica.  T.A. reported that J.H. had no influence or authority in managing this area within C3T.  However, a review of Transamerica Retirement Services Corporation Contract Agreement with C3T disclosed there are two agreements in place – one agreement signed by L.M. on February 3, 2011, and a second agreement signed by J.H. on September 6, 2011.

91.     CS-1 reported that in approximately December 2012, J.H. was removed from C3T's payroll, business structure, and office space to create the illusion that J.H. was no longer

27

affiliated with C3T and that T.A. alone owned and controlled C3T. On January 8, 2013, T.A. submitted updated company records to CVE and a request for re-verification of C3T's SDVOSB status. T.A. reported that T.A. was now the sole owner of C3T and J.H. was no longer affiliated with the company. Based on these submissions, C3T's SDVOSB status was reinstated on February 22, 2013. Subsequently, C3T has received substantial additional SDVOSB set-aside contracts and payments, as detailed in the table below.

92. CS-1 reported that, in truth, J.H had moved into a newly built office space in C3T's warehouse area located behind C3T's office suite, and that J.H. continued to control and manage day-to-day operations of C3T.

93. During C3T's 2015 re-verification process, CVE conducted a site inspection, records review, and interview of T.A. During the interview, T.A. acknowledged that J.H. was still involved with C3T, but asserted that J.H. was no longer an owner or in control of C3T, and instead was merely an employee, working as a project manager.

94. A review of the subcontractor lists that C3T had submitted to CVE suggests that C3T concealed its relationship with Pagasa and Sonag. Specifically, C3T reported that, in 2014, C3T had subcontracted only $23,395 to Pagasa, but according to C3T's financial records, C3T actually had paid Pagasa approximately $210,000 during 2014. Likewise, C3T reported that C3T had not subcontracted any work to Sonag during 2014 and 2015, but, in fact, C3T had paid Sonag approximately $101,000 in 2014 and approximately $93,000 in 2015. In addition, C3T did not report any subcontractor work with Trinity Marketing Services, a Ganos-owned company, but C3T issued two checks to Trinity Marketing Services totaling $75,000 in 2015.

95. A review of Trinity Marketing Services, Inc. financial records revealed that it is a Ganos-owned C Corporation established in July 2010. Brian Ganos is the only authorized signer

on the account, and the address listed on the account is Brian Ganos' residence at S71 W17XXX

Lake Drive, Muskego, Wisconsin. A review of the account activity revealed numerous personal

expense payments, such as cosmetic surgery, and payments to Holz Motors, Inc. (an auto

dealership in Hales Corners, Wisconsin), Hanna Trailer & RV Supply, Milwaukee Harley

Davison, Mirage Casino Hotel, Water Bugs Ski Club, Zephyr Mountain Lodge Association, and

cash withdrawals.

**C3T's Government Contracts**

96.     A review of the Federal Procurement Database revealed that from May 2006

through April 2016, C3T received approximately $192 million in SDVOSB set-aside contracts.

97.     C3T made yearly certifications on ORCA, and later through SAM, that it was an

SDVOSB. Available records beginning on April 26, 2006, through June 4, 2011, identify that

J.H. made these certifications.   Available records identify that on May 21, 2012, T.A. made this

certification from the IP address of 67.53.131.78. Subscriber records show that this IP address

was issued to, and paid for by, Sonag at the Defendant Florist Avenue Property. The

certification made by T.A. on May 20, 2015, was from IP address 24.167.199.138. Subscriber

records reveal that this IP address was also issued to, and paid for by, Sonag at the Defendant

Florist Avenue Property.

98.     VA and Department of Defense contracting officials primarily relied on C3T's

self-certifications to determine C3T's eligibility to bid upon and receive status-based contracts.

Below are federal set-aside SDVOSB contracts that C3T received based upon their certifications

from April 2012 through March 2016:

29

| Contract ID | Contracting Agency Name | Date Signed to include modifications and task orders | Action Obligation to include mods | ORCA Validated | Certified By | Owner IP Address |
|---|---|---|---|---|---|---|
| W911SA12D0015 | ARMY | 9/25/2012-3/23/2016 | $816,256.18 | YES | T.A. | Sonag |
| VA26314C0058 | VA | 12/5/2012-12/23/2015 | $8,968,675.00 | YES | T.A. | Sonag |
| VA69D12C0084 | VA | 4/15/2012-2/19/2013 | $1,033,713.87 | YES | T.A. | Sonag |
| VA69D13C0150 | VA | 3/27/2013-4/11/2014 | $890,332.00 | YES | T.A. | Sonag |
| VA26313C0191 | VA | 6/28/2013-2/17/2015 | $965,185.87 | YES | T.A. | Sonag |
| VA26313C0214 | VA | 07/30/2013 | $1,375,454.00 | YES | T.A. | Sonag |
| VA26314C0054 | VA | 3/21/2014-10/14/2015 | $2,787,500.85 | YES | T.A. | Sonag |
| VA69D14C0229 | VA | 6/27/2014-10/27/2015 | $2,338,436.00 | YES | T.A. | Sonag |
| | | Total | $19,175,553.77 | | | |

99.     The contract payments listed above were for progress payments, task orders, and/or modifications to SDVOSB set-aside contracts awarded to C3T.  These contract payments originated from the VA through the U.S. Treasury and the Department of Defense through DFAS.  Once payments were authorized by the agency, the funds were electronically transferred to C3T's account at BMO Harris Bank.

100.     In order to do business with the VA, a contractor must be registered and given a VA Vendor Identification.  When it is time to release a payment to a contractor, a VA contracting officer submits a request for payment through the VA's Financial Service Center to the U.S. Treasury's Financial Management System, which then causes an electronic payment to be released from the Federal Reserve Bank in New Jersey to the contractor by means of wire to their respective financial account.  The VA retains a voucher as a record of payment.

30

**Pagasa's Formation and Operation**

101.    Brian Ganos, as a former participant in the 8(a) Program, is not eligible to be a majority owner of a different 8(a) company.  CS-1 reported that since Nuvo graduated from the 8(a) set-aside program in 2013, Brian Ganos and J.H. have sought to establish a new minority-owned business to obtain government 8(a) set-aside contracts.

102.    I submit that evidence shows that Pagasa was being supported by Brian Ganos' affiliated companies in an attempt to establish it as an ongoing concern to fulfill the SBA regulations that require a small business have at least two years of successful work history before requesting SBA 8(a) status.

103.    According to the Wisconsin Department of Financial Institutions, Pagasa registered with the state of Wisconsin on May 23, 2012.  Pagasa's president and purported owner was an individual having the initials "O.M.," an Asian-Pacific American female who meets the social and economic requirements to be an 8(a) participant.  CS-1 reported that O.M. was chosen by Brian Ganos because O.M. had been a project manager for C3T for approximately four years and has a college degree in construction management.

104.    On October 10, 2013, O.M. registered Pagasa on the GSA managed database SAM at business address 2XXX S. 58th Street, West Allis, Wisconsin.  However, GSA captured the IP address from O.M.'s certification as 67.53.131.78, which is a Sonag-owned IP account, located in the Defendant Florist Avenue Property, which is owned by Brian Ganos and which houses Sonag, Nuvo, and C3T.  O.M. certified under penalty of perjury that Pagasa meets all the requirements to be eligible to be an 8(a) company.

105.     On February 23, 2015, O.M. applied for Pagasa's 8(a) certification through the SBA website.  O.M. reported that O.M. was the president and 100% owner of the company, and O.M. listed Pagasa's address as 2XXX S. 58th Street, West Allis, Wisconsin.

106.     On O.M.'s SBA profile, O.M. reported that O.M. had been a Project Manager for C3T from 2009-2011.  However, C3T's employee payroll report showed that in 2012, while O.M. claimed to be running Pagasa, O.M. received $32,608.17 in income from C3T.

107.     O.M. also submitted to the SBA an organization chart that listed J.H. as O.M.'s project manager and estimator.  Although 8(a) Program rules require O.M. to be the highest-paid employee of the company, records showed that J.H. had received more compensation from Pagasa in 2013 and 2014 than O.M. had received.  O.M. explained to SBA that J.H. had made more money than O.M. in 2013 due to a project J.H. secured, and in 2014 due to the premature birth of O.M.'s son, which caused O.M. to be off of work for a significant amount of time.

108.     CS-1 reported that J.H. was endeavoring to establish a work history for Pagasa by obtaining small state and county projects.  Once Pagasa received 8(a) status, J.H. was expected to return to C3T, which J.H. did in 2014.

109.     Pagasa's SBA records contained a list of contracts Pagasa participated in from March 1, 2013, through August 1, 2014.  The list identifies 13 projects, five of which were for LJ Properties, a Ganos-owned company, which paid Pagasa a combined total of $235,960.  One of the contracts listed was for C3T, which paid Pagasa $125,000.  O.M. provided a personal statement in which O.M. reported there was no affiliation between Pagasa and C3T.

110.     Pagasa's financial records revealed that from September 12, 2012, through September 12, 2014, Pagasa had received $412,995 from C3T, which contradicts O.M.'s submission to the SBA that identified only $125,000 in contracts with C3T.

111. O.M. did not identify in the business plan or the contract list that O.M. had provided to SBA that Pagasa had any relationship with Nuvo or Sonag I, another Brian Ganos-owned company. However, Pagasa's financial records show that Pagasa received $126,075 from Nuvo between December 12, 2012, and March 21, 2014. Pagasa also received $100,866.50 from Sonag I between May 8, 2013, and June 2, 2015.

112. Although Pagasa was allegedly being paid for completing work on these contracts, CS-1 reported that Pagasa was not doing any actual work. Instead, the work was performed by C3T, Nuvo, and Sonag employees, and Pagasa was identified as a subcontractor only to establish a work history for work that had ostensibly been performed by Pagasa.

113. Financial records for Pagasa and C3T show that Pagasa's Tri City bank account was opened on September 17, 2012, with a $5,000 check from C3T. However, in O.M.'s October 2015 business plan submitted to SBA, O.M. reported that O.M. personally had provided the funding for the initial capitalization of the company.

114. On September 1, 2015, Pagasa obtained its 8(a) certification.

115. O.M. provided SBA a business plan for Pagasa that was signed on October 5, 2015, and approved on November 25, 2015. In this plan, O.M. listed O.M.'s home and business address as 2XXX S. 58th Street, West Allis, WI. O.M. also identified business relationships and former projects with Milwaukee Piping and Plumbing, Inc., LJ Properties of Wisconsin, Sonag Load and Go, and Sonag Ready Mix. O.M. did not identify any business relationships with Nuvo, Sonag, or her former employer, C3T.

116. On October 22, 2015, an SBA employee having the initials "S.M." conducted Pagasa's 8(a) program orientation, which took place at Pagasa's newly acquired office space located at the Defendant Florist Avenue Property, which is the same building that also houses

33

Sonag, Nuvo, and C3T. O.M. informed S.M. that Pagasa had recently moved into the new office space and explained that O.M. was able to move into the retail space without having to sign a formal lease. S.M. recalled that the next-door tenant was C3T, and that there was an open entrance (not a doorway) in the back of Pagasa's office, on the south wall, that appeared to lead to C3T's office space.

117. During the orientation, O.M. explained to S.M. that O.M. was the 100% owner of Pagasa and that Pagasa employed approximately four full-time employees, including herself. O.M. was instructed to revise her business plan and to provide SBA with a signed lease agreement.

118. After the orientation, O.M. emailed her lease to the SBA. A review of the Pagasa's lease agreement showed that it was for 60 months, starting on October 1, 2015, and ending on September 30, 2020. According to the lease agreement, the owner of the building was Sonag I, a Ganos-owned company.

**Contract Accountant, L.M.**

119. CS-1 reported that L.M. performed all the corporate accounting functions for Sonag, Nuvo, and C3T, and that L.M. had work space within the Defendant Florist Avenue Property. However, L.M. was a private contractor and not an employee of any of the Ganos-owned companies.

120. A former Nuvo employee advised that he did not know the accountant for Nuvo very well, but recalled that the accountant worked for Sonag and C3T as well.

121. Surveillance of the office building revealed that L.M. worked at the Defendant Florist Avenue Property, which houses Sonag, Nuvo, C3T, and Pagasa. During the surveillance

period, L.M. was seen entering the building at the property approximately 8:00 a.m. daily, and leaving at approximately 4:30 p.m. Monday through Friday.

122.     In October 2012, federal agents interviewed L.M. regarding L.M.'s involvement with C3T and Sonag. L.M. reported that from April 2002 to October 2010, L.M. was employed by Sonag to monitor and report all Sonag's financial data. While L.M. was employed with Sonag, L.M. met J.H., whom L.M. described as Sonag's Vice President. In approximately 2006, L.M. assisted J.H. and T.A. in establishing C3T by filling out and filing the required documents and online database entries. After 2010, L.M. left Sonag and became a self-employed accountant. L.M. stated that C3T is one of L.M.'s biggest clients and requires most of her time. L.M. explained that she provides all necessary accounting services, including the preparation of all financial records and reports. L.M. explained that she reports C3T's financial status to T.A. on a daily or weekly basis.

123.     A review of C3T's corporate records revealed that, in 2006, L.M. was listed as the alternate point of contact for C3T in the CCR database.

124.     CS-1 stated that L.M. has control over the entire general ledger function and the financial accounts for all of the referenced companies, which enables L.M. to transfer profits from job-to-job and company-to-company[4] within the job-cost software, which illustrates the affiliation between those companies.

125.     CS-1 reported that L.M. frequently placed expenses with projects for which they were not incurred. During a consensually recorded conversation with L.M., CS-1 confronted L.M. about the practice of transferring unrelated expenses to Nuvo projects. CS-1 told L.M. that

---

[4] In the accounting profession, this activity is commonly referred to as "profit shifting" or "profit smoothing." But such profit shifting is not a legitimate practice between non-affiliated companies.

CS-1 understood why L.M. did it, to improve the appearance of profitability to the banks and bonding companies, to which L.M. replied "Uh-Huh."

126. A review of public records indicates L.M. owns LJM Accounting Services, Inc. ("LJMAS"). According to DFI records, as of January 2016 the business address for LJMAS was L.M.'s residence located at W147 N5XXX Dolphin Drive, Menomonee Falls, Wisconsin. A review of Transamerica Retirement Solutions records revealed that correspondence for Sonag's, Nuvo's, C3T's, and Pagasa's 401(k) accounts are being sent to L.M.'s LJMAS home business address. L.M. was listed as the primary contact for these 401(k) accounts. A review of L.M.'s bank records showed that L.M. had no income other than that from Sonag, Nuvo, C3T, and Pagasa.

**Sonag I's Bank Accounts**

127. Bank records show that Sonag I LLC maintained BMO Harris Bank account ending in 6975 ("Sonag I 6975"). Sonag I 6975 was opened in December 2008 and received deposits from C3T and Nuvo during the review period, which was from 2008 to 2015. Sonag I LLC also maintained US Bank account ending in 2552, in the name of Brian Ganos/Sonag I LLC ("Sonag I 2552"). Sonag I 2552 was opened in May 2010 and received deposits from Nuvo and C3T during the review period, which was from 2010 to 2016.

**Nuvo's Bank Accounts**

128. BMO Harris Bank records show that Nuvo Construction Company, Inc. maintained a checking account with Community Bank Group, account number ending in 3889 prior to December 31, 2007, until September 7, 2008, when BMO Harris Bank purchased Community Bank Group and converted Nuvo's Community Bank Group 3889 account to BMO

Harris checking account number ending in 1990 ("Nuvo 1990"). Nuvo maintained this checking account until February 21, 2014, as one of its primary business accounts.

129.    US Bank records indicate that Nuvo also maintained checking account ending in 3755 ("Nuvo 3755").

130.    Tri City Bank records indicate that Nuvo also maintained checking account ending in 2357 ("Nuvo 2357").

131.    Checks written from the Nuvo 1990, Nuvo 2357, and Nuvo 3755 accounts, ostensibly for Nuvo to pay rent to Sonag I for Nuvo's leasing space in the Defendant Florist Avenue Property, were made payable to Sonag I LLC and deposited to the Sonag I LLC 6975 and 2552 bank accounts. On the books of Nuvo, these payments were coded to the rent expense account in the general ledger. On the books of Sonag I LLC, these payments were recorded as rent income.

**C3T's Bank Accounts**

132.    Bank records show that C3T maintained a checking account ending in 5866 ("C3T 5866") as its primary business account at BMO Harris Bank. C3T 5866 was opened on January 13, 2005. J.H. and T.A. were listed as signers on the account as of December 5, 2011. The name and address displayed on the monthly statements during the review period is C3T Inc., 6045 North 55th Street, Milwaukee WI 53218.

133.    Checks written from the C3T 5866 account, ostensibly for C3T to pay rent to Sonag I for C3T's leasing space in the Defendant Florist Avenue Property, were made payable to Sonag I LLC and were deposited to the Sonag I LLC 6975 and 2552 bank accounts. On the books of C3T, these payments were coded to the rent expense account in the general ledger. On the books of Sonag I LLC, these payments were recorded as rent income.

**Fraudulent Beginning and Perpetuation of Nuvo and C3T**

134.    Nuvo and C3T owed their beginnings to this fraud scheme.  As detailed above, Ganos worked with J.L. and others to create Nuvo, to place J.L. as the straw owner of Nuvo, and to obtain 8(a) approval for Nuvo – all so that Nuvo could fraudulently obtain 8(a) contracts that Ganos and Sonag Co. were no longer eligible to receive.

135.    Likewise, Ganos worked with T.A., J.H., and L.M. to create C3T, to place T.A. as the straw owner of C3T, and to register C3T as a SDVOSB entity specifically – all so that C3T could fraudulently obtain SDVOSB contracts that Ganos, Sonag Co., and Nuvo could not receive.

136.    After founding Nuvo and C3T, Ganos and his co-conspirators perpetuated the fraud scheme by making false representations about Nuvo's and C3T's eligibility for the 8(a) and SDVOSB programs, by obtaining set-aside government contracts, and by laundering the proceeds and profits from those contracts for the benefit of Ganos and others.

137.    But for the revenues and profits that Nuvo and C3T made through this fraud scheme, neither Nuvo nor C3T would likely have continued to exist following their founding.

**Percentage of Nuvo's Revenues Derived from Fraudulently Obtained 8(a) Set-Aside Contracts Overall and During Years When Nuvo Paid Excess Rent to Sonag I**

138.    According to Nuvo's general ledger, between January 2004 and December 2015, Nuvo received approximately $124.6 million in gross revenues.[5]

139.    A review of the Federal Procurement Database in April 2016 showed that Nuvo received a total of $60 million in 8(a) set-aside contracts between January 2004 and December 2015.

_____

[5] As noted above, Nuvo's general ledger also reflects an additional $52 million in revenue that is excluded from the total above because it was passed through entirely to Sonag Ready Mix LLC, another Ganos-controlled company.

140.     Thus, between January 2004 and December 2015, approximately 57% of Nuvo's gross revenues are known, at present, to be traceable to fraudulently obtained 8(a) contracts.

141.     For years 2008 through 2016, during which years Nuvo made "excess" ostensible rent payments to Sonag I, the approximate percentages of Nuvo's gross revenues consisting of revenues that Nuvo had earned on fraudulently obtained 8(a) set-aside contracts were as follows:

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| Percentage of Nuvo's Gross Revenues derived from 8(a) contracts | 62% | 75% | 43% | 45% | 30% | 10% | 1% | 4% | 6% |

**Percentage of C3T's Revenues Derived from Fraudulently Obtained SDVOSB Set-aside Contracts Overall and During Years C3T Paid Excess Rent to Sonag I**

142.     C3T's general ledger reflects that, between January 2006 and April 2016, C3T received approximately $204.7 million in gross revenues.

143.     A review of the Federal Procurement Database in April 2016 showed that, between January 2006 and April 2016, C3T had received a total of $192 million in revenue from SDVOSB set-aside contracts.

144.     Thus, between January 2006 and April 2016, approximately 96% of C3T's gross revenues are known, at present, to be traceable to fraudulently obtained SDVOSB set-aside contracts.

145.     For years 2008 through 2016, during which years C3T made "excess" ostensible rent payments to Sonag I, the approximate percentages of C3T's gross revenues consisting of revenues that C3T had earned on fraudulently obtained SDVOSB set-aside contracts were as follows:

39

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| **Percentage of C3T's Gross Revenues derived from SDVOSB contracts** | 87% | 100% | 100% | 100% | 89% | 83% | 88% | 93% | 52% |

**Ganos' Transfer of $253,547 in Estimated Excess Rent Payments from Nuvo 1990, Nuvo 2357, and Nuvo 3755 to Sonag I LLC for Nuvo's Ostensible Lease of Space in the Defendant Florist Avenue Property**

146.    As illustrated in the chart below, from April 3, 2008, through July 1, 2016, Ganos caused Nuvo to transfer approximately $608,950 in ostensible rent payments for Nuvo's lease of space in the Defendant Florist Avenue Property.

| PAYEE | TYPE | # | DATE | AMT |
|---|---|---|---|---|
| **SONAG I LLC** | CHK | 5692 | 4/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 5692 | 4/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 5692 | 4/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 5692 | 4/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 6028 | 6/30/2008 | $1,000 |
| **SONAG I LLC** | CHK | 6028 | 6/30/2008 | $1,000 |
| **SONAG I LLC** | CHK | 6487 | 10/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 6487 | 10/3/2008 | $1,000 |
| **SONAG I LLC** | CHK | 6487 | 10/3/2008 | $1,000 |
| **SONAG I LLC** | GEN | 1086 | 12/31/2008 | $75,000 |
| **SONAG I LLC** | GEN | 1254 | 7/2/2009 | $10,000 |
| **SONAG I LLC** | GEN | 1293 | 8/25/2009 | $15,000 |
| **SONAG I LLC** | GEN | 1313 | 9/11/2009 | $2,500 |
| **SONAG I LLC** | GEN | 1373 | 11/6/2009 | $10,000 |
| **SONAG I LLC** | GEN | 1385 | 11/24/2009 | $15,000 |
| **SONAG I LLC** | GEN | 1407 | 12/23/2009 | $75,000 |
| **SONAG I LLC** | CHK | 10379 | 10/6/2010 | $4,900 |
| **SONAG I LLC** | CHK | 10487 | 11/2/2010 | $4,900 |
| **SONAG I LLC** | CHK | 10643 | 12/1/2010 | $4,900 |
| **SONAG I LLC** | CHK | 10855 | 1/14/2011 | $4,900 |
| **SONAG I LLC** | CHK | 10963 | 2/4/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11131 | 3/24/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11208 | 4/4/2011 | $4,550 |
| **SONAG I LLC** | CHK | 11259 | 5/2/2011 | $4,900 |

40

| | | | | |
|---|---|---|---|---|
| **SONAG I LLC** | CHK | 11390 | 6/1/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11470 | 7/1/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11686 | 8/25/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11710 | 9/2/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11831 | 10/11/2011 | $4,900 |
| **SONAG I LLC** | CHK | 11969 | 11/1/2011 | $4,900 |
| **SONAG I LLC** | CHK | 12261 | 2/1/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12383 | 3/7/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12467 | 4/4/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12680 | 6/6/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12680 | 6/6/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12724 | 7/3/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12815 | 8/1/2012 | $4,900 |
| **SONAG I LLC** | CHK | 12956 | 9/10/2012 | $4,900 |
| **SONAG I LLC** | CHK | 13017 | 10/10/2012 | $6,250 |
| **SONAG I LLC** | CHK | 13064 | 11/1/2012 | $6,250 |
| **SONAG I LLC** | CHK | 13137 | 12/6/2012 | $6,250 |
| **SONAG I LLC** | CHK | 13342 | 1/20/2013 | $6,250 |
| **SONAG I LLC** | CHK | 13353 | 2/4/2013 | $6,250 |
| **SONAG I LLC** | CHK | 13449 | 3/4/2013 | $6,250 |
| **SONAG I LLC** | CHK | 13737 | 5/1/2013 | $6,250 |
| **SONAG I LLC** | CHK | 13737 | 5/1/2013 | $6,250 |
| **SONAG I LLC** | CHK | 13924 | 6/4/2013 | $6,250 |
| **SONAG I LLC** | CHK | 14034 | 7/17/2013 | $6,250 |
| **SONAG I LLC** | CHK | 14123 | 8/9/2013 | $6,250 |
| **SONAG I LLC** | CHK | 14230 | 9/12/2013 | $6,250 |
| **SONAG I LLC** | CHK | 14321 | 10/10/2013 | $6,250 |
| **SONAG I LLC** | CHK | 14431 | 11/11/2013 | $6,250 |
| **SONAG I LLC** | CHK | 133874 | 3/7/2014 | $6,250 |
| **SONAG I LLC** | CHK | 133874 | 3/7/2014 | $6,250 |
| **SONAG I LLC** | CHK | 133874 | 3/7/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15005 | 4/23/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15157 | 6/4/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15157 | 6/4/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15562 | 9/9/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15562 | 9/9/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15562 | 9/9/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15890 | 12/2/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15890 | 12/2/2014 | $6,250 |
| **SONAG I LLC** | CHK | 15897 | 12/3/2014 | $6,250 |
| **SONAG I LLC** | CHK | 16194 | 2/3/2015 | $6,250 |
| **SONAG I LLC** | CHK | 16403 | 3/6/2015 | $6,250 |
| **SONAG I LLC** | CHK | 16403 | 3/6/2015 | $6,250 |
| **SONAG I LLC** | CHK | 16627 | 4/24/2015 | $6,250 |
| **SONAG I LLC** | CHK | 16673 | 5/1/2015 | $6,250 |

| SONAG I LLC | CHK | 16874 | 6/15/2015 | $6,250 |
| SONAG I LLC | CHK | 16999 | 7/9/2015 | $6,250 |
| SONAG I LLC | CHK | 17108 | 8/7/2015 | $6,250 |
| SONAG I LLC | CHK | 17224 | 9/4/2015 | $6,250 |
| SONAG I LLC | CHK | 17392 | 10/13/2015 | $6,250 |
| SONAG I LLC | CHK | 17653 | 12/8/2015 | $6,250 |
| SONAG I LLC | CHK | 17653 | 12/8/2015 | $6,250 |
| SONAG I LLC | CHK | 17770 | 1/8/2016 | $6,250 |
| SONAG I LLC | CHK | 17872 | 2/1/2016 | $6,250 |
| SONAG I LLC | CHK | 17988 | 3/2/2016 | $6,250 |
| SONAG I LLC | CHK | 18114 | 4/1/2016 | $6,250 |
| SONAG I LLC | CHK | 18198 | 5/3/2016 | $7,500 |
| SONAG I LLC | CHK | 18298 | 6/1/2016 | $7,500 |
| SONAG I LLC | CHK | 18400 | 6/29/2016 | $2,500 |
| SONAG I LLC | CHK | 18405 | 7/1/2016 | $10,000 |
| | | | | **$608,950** |

147.    As illustrated in the chart above, on April 3, 2008, Ganos began making a series of rent payments, which continued until July 2016, from Nuvo to Sonag I, LLC, ostensibly for Nuvo to rent space from Sonag in the Defendant Florist Avenue Property.  Each of the above transactions was recorded as rent expense in the Nuvo general ledger.  Each of the above transactions was also recorded as rent income in the Sonag I general ledger.

148.    These rent payments were irregular in that they were not made in the same dollar amount, or on the same date, that was specified in the lease agreement between Nuvo and Sonag I, LLC.

149.    A lease agreement between Nuvo and Sonag I, LLC dated August 1, 2004, was provided to the SBA.  The lease agreement indicates Nuvo would be paying $400 per month for the first year of a five-year lease agreement, starting August 1, 2004, through July 31, 2005.  The lease amount was then scheduled to increase by $20 per month over the remaining four years of the lease period, with the final lease amount being $480 per month from August 1, 2008, through July 31, 2009.

42

150.     Per the lease agreement, the rent payments from Nuvo to Sonag I should have begun in 2004.  However, Nuvo did not begin making the lease payments to Sonag until April 3, 2008, or four years into the lease period.  Per the lease agreement, the rent payments from Nuvo to Sonag I should have totaled $26,400 for the five years identified in the lease document.  However, the total that Nuvo in fact paid Sonag between April 3, 2008, and August 25, 2009, totaled $109,000.

151.     The SBA was not provided any additional signed lease agreements by Nuvo.

152.     However, a document titled "Rent Rolls," dated April 4, 2008, was found on L.M.'s computer.  This document indicates that Nuvo was renting 1,144 square feet in the Defendant Florist Avenue Property.  A second document, dated April 30, 2009, titled "Building 55th Florist – Annual Budget Information," was found on L.M.'s computer.  That document indicates that Nuvo's total square footage had by then increased to 5,398 square feet.

153.     Using this increased square footage, and – to be conservative – the higher per-square-foot rental rates of $0.57 and $0.82 indicated in four unsigned C3T lease amendments for the lease periods beginning April 1, 2009, and described in paragraph 170 below, Nuvo should have paid rent to Sonag I totaling $355,403 for the period August 1, 2004, through July 31, 2016.

154.     However, the actual payments, recorded as rent payments on the general ledgers, that Nuvo made to Sonag I during that time period totaled $608,950.

155.     The difference between: (a) the $608,950 amount that Nuvo actually transferred to Sonag I through payments characterized as rent, and (b) the rental amounts that Nuvo owed Sonag I under the original lease, as escalated by the increased square footage and increased rental rates indicated above, is $253,547.  Thus, between 2008 and 2016, Nuvo paid excess rent, conservatively calculated as approximately **$253,547**.

43

156. As noted in the table above, the rental payments that Nuvo made to Sonag I vastly exceeded the amount due under the lease, even assuming escalating rental payments due to increased square footage and increased per-square-foot rental rates.

157. In addition, the rental payments Nuvo made to Sonag I are also inconsistent with the dates on which rental payments were to have been due under the lease agreement.

158. Both of these facts indicate that the Nuvo's rent payments to Sonag – and particularly Nuvo's excess ostensible rent payments to Sonag I – were in fact financial transactions by which Ganos surreptitiously transferred criminal proceeds from Nuvo's bank accounts to Sonag I's bank accounts, which Ganos controlled.

**The $253,547 in Estimated Excess Ostensible Rent Payments Transferred from Nuvo 1990, Nuvo 2357, and Nuvo 3755 to the Sonag I 6975 and 2552 Accounts Included Criminal Proceeds Nuvo Received from Fraudulently Obtained Set-Aside Contracts**

159. Nuvo's excess ostensible rent payments to Sonag I, LLC were funded in material part by 8(a) fraud proceeds.

160. As noted in the table in paragraph 141 above, for years 2008 through 2016, during which years Nuvo made "excess" ostensible rent payments to Sonag I, the approximate percentage of Nuvo's gross revenues consisting of revenues Nuvo had earned on 8(a) set-aside contracts were: 62% (2008), 75% (2009), 43% (2010), 45% (2011), 30% (2012), 10% (2013), 1% (2014), 4% (2015), and 6% (2016).

161. I have been advised by the Asset Forfeiture Coordinator for the U.S. Attorney's Office for the Eastern District of Wisconsin, that because a substantial portion of Nuvo's revenues for each of these years, other than 2014, consisted of proceeds of fraudulently obtained 8(a) set-aside contracts, the government may lawfully infer under accepted tracing principles that an equally substantial portion of Nuvo's expenditures during each of those years were funded by

proceeds of fraudulently obtained 8(a) set-aside contracts. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986) (discussing the "averaging" tracing rule, which may be used to trace criminal proceeds transferred or expended from a bank account, and under which the traceable proceeds of any withdrawal from the account is the pro rata share of proceeds in the withdrawal, determined by the ratio of the criminal proceeds on deposit to the total funds in the account, immediately before the withdrawal).

**Ganos Intended to Transfer Criminal Proceeds from the Nuvo 1990, Nuvo 2357, and Nuvo 3755 Accounts to Accounts He Solely Controlled, Including the Sonag I Accounts**

162.    Ganos intended to transfer criminal proceeds from Nuvo to accounts he solely controlled.

163.    According to S.F., who worked as a Nuvo project manager from 2003 through 2011, Brian Ganos made it clear that profits were not to be left on Nuvo's books. If Nuvo projects made money, Brian Ganos depleted those Nuvo profits – either by spending those profits on non-Nuvo expenses or by transferring those profits to bank accounts controlled by Brian Ganos. S.F. was told to keep J.L. "in the dark" about how much money Nuvo was making, because Brian Ganos did not feel that J.L. was "entitled" to the Nuvo profits.

164.    I submit that, by the above excess rent payments, Ganos transferred criminal proceeds he had made through Nuvo as a part of the 8(a) fraud scheme from the Nuvo 1990, Nuvo 2357, and Nuvo 3755 accounts to the Sonag I 6975 and Ganos/Sonag I 2552 accounts for the purpose of transferring those proceeds from Nuvo accounts to accounts that Ganos controlled, in a surreptitious manner.

165.    Specifically, I submit that Ganos made these excess rental payments to transfer set-aside fraud proceeds he had obtained via Nuvo to Sonag I bank accounts, and his own bank account, in a manner intended to conceal, among other things:  (a) the nature of those proceeds,

45

namely, that they were obtained via 8(a) fraud; (b) the source of those proceeds, namely, that they came from 8(a) contract money paid to Nuvo; (c) the location of those proceeds, in that Ganos' movement of the funds from Nuvo accounts through Sonag accounts helped to conceal the ultimate location of the money that Nuvo earned via 8(a) contracts; and (d) the true ownership of those criminally derived proceeds.

**Ganos' Transfer of $96,798 in Estimated Excess Rental Payments to Sonag I LLC for C3T's Ostensible Lease of Space in the Defendant Florist Avenue Property**

166.    As illustrated in the chart below, from April 3, 2008, through July 1, 2016, Ganos caused C3T to transfer approximately $604,498 to Sonag I, LLC, ostensibly as rental payments for C3T's lease of space in the Defendant Florist Avenue Property.

| PAYEE | TYPE | # | DATE | AMT |
|---|---|---|---|---|
| SONAG I LLC | CHK | 2448 | 4/3/2008 | $1,000 |
| SONAG I LLC | CHK | 2448 | 4/3/2008 | $1,000 |
| SONAG I LLC | CHK | 2448 | 4/3/2008 | $1,000 |
| SONAG I LLC | CHK | 2448 | 4/3/2008 | $1,000 |
| SONAG I LLC | CHK | 2545 | 6/30/2008 | $1,000 |
| SONAG I LLC | CHK | 2545 | 6/30/2008 | $1,000 |
| SONAG I LLC | CHK | 2682 | 10/9/2008 | $1,000 |
| SONAG I LLC | CHK | 2682 | 10/9/2008 | $1,000 |
| SONAG I LLC | CHK | 2682 | 10/9/2008 | $1,000 |
| SONAG I LLC | XFER | 450 | 12/31/2008 | $35,748 |
| SONAG I LLC | XFER | 584 | 7/2/2009 | $10,000 |
| SONAG I LLC | XFER | 620 | 8/25/2009 | $15,000 |
| SONAG I LLC | XFER | 640 | 9/11/2009 | $2,500 |
| SONAG I LLC | XFER | 693 | 11/6/2009 | $10,000 |
| SONAG I LLC | XFER | 699 | 11/24/2009 | $15,000 |
| SONAG I LLC | XFER | 729 | 12/23/2009 | $75,000 |
| SONAG I LLC | XFER | 1004 | 8/30/2010 | $10,000 |
| SONAG I LLC | CHK | 5673 | 10/6/2010 | $4,550 |
| SONAG I LLC | CHK | 5794 | 11/5/2010 | $4,550 |
| SONAG I LLC | CHK | 6059 | 12/7/2010 | $4,550 |
| BRIAN GANOS | CHK | 6105 | 12/15/2010 | $14,000 |
| SONAG I LLC | CHK | 6332 | 1/18/2011 | $4,550 |
| SONAG I LLC | CHK | 6481 | 2/16/2011 | $4,550 |
| SONAG I LLC | CHK | 6651 | 3/23/2011 | $4,550 |
| SONAG I LLC | CHK | 6781 | 4/1/2011 | $4,550 |

46

| | | | | |
|---|---|---|---|---|
| **SONAG I LLC** | CHK | 6840 | 5/2/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7010 | 6/1/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7122 | 7/1/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7384 | 8/25/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7407 | 9/2/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7553 | 10/13/2011 | $4,550 |
| **SONAG I LLC** | CHK | 7775 | 11/1/2011 | $4,550 |
| **SONAG I LLC** | CHK | 8159 | 2/1/2012 | $4,550 |
| **SONAG I LLC** | CHK | 8291 | 3/1/2012 | $4,550 |
| **SONAG I LLC** | CHK | 8422 | 4/4/2012 | $4,550 |
| **SONAG I LLC** | CHK | 8794 | 6/5/2012 | $4,550 |
| **SONAG I LLC** | CHK | 8794 | 6/5/2012 | $4,550 |
| **SONAG I LLC** | CHK | 8887 | 7/3/2012 | $4,550 |
| **SONAG I LLC** | CHK | 9075 | 8/1/2012 | $4,550 |
| **SONAG I LLC** | CHK | 9258 | 9/5/2012 | $4,550 |
| **SONAG I LLC** | CHK | 9463 | 10/18/2012 | $6,550 |
| **SONAG I LLC** | CHK | 9571 | 11/1/2012 | $6,550 |
| **SONAG I LLC** | CHK | 9927 | 12/31/2012 | $6,550 |
| **SONAG I LLC** | CHK | 9998 | 1/18/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10071 | 2/4/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10222 | 3/5/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10445 | 5/1/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10445 | 5/1/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10530 | 6/5/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10658 | 7/23/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10721 | 8/8/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10794 | 9/12/2013 | $6,550 |
| **SONAG I LLC** | CHK | 10949 | 10/15/2013 | $6,550 |
| **SONAG I LLC** | CHK | 11049 | 11/12/2013 | $6,550 |
| **SONAG I LLC** | CHK | 11158 | 12/13/2013 | $6,550 |
| **SONAG I LLC** | CHK | 11536 | 3/7/2014 | $6,550 |
| **SONAG I LLC** | CHK | 11536 | 3/7/2014 | $6,550 |
| **SONAG I LLC** | CHK | 11536 | 3/7/2014 | $6,550 |
| **SONAG I LLC** | CHK | 11775 | 5/7/2014 | $6,550 |
| **SONAG I LLC** | CHK | 11775 | 5/7/2014 | $6,550 |
| **SONAG I LLC** | CHK | 11861 | 6/10/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12199 | 9/8/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12199 | 9/8/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12199 | 9/8/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12427 | 11/25/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12427 | 11/25/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12435 | 12/1/2014 | $6,550 |
| **SONAG I LLC** | CHK | 12640 | 1/30/2015 | $6,550 |
| **SONAG I LLC** | CHK | 12640 | 1/30/2015 | $6,550 |
| **SONAG I LLC** | CHK | 12826 | 3/5/2015 | $6,550 |

| SONAG I LLC | CHK | 12975 | 4/17/2015 | $6,550 |
|---|---|---|---|---|
| SONAG I LLC | CHK | 13034 | 5/4/2015 | $6,550 |
| SONAG I LLC | CHK | 13215 | 6/16/2015 | $6,550 |
| SONAG I LLC | CHK | 13260 | 7/2/2015 | $6,550 |
| SONAG I LLC | CHK | 13379 | 8/6/2015 | $6,550 |
| SONAG I LLC | CHK | 13486 | 9/4/2015 | $6,550 |
| SONAG I LLC | CHK | 13610 | 10/13/2015 | $6,550 |
| SONAG I LLC | CHK | 13785 | 12/7/2015 | $6,550 |
| SONAG I LLC | CHK | 13785 | 12/7/2015 | $6,550 |
| SONAG I LLC | CHK | 13980 | 1/14/2016 | $6,550 |
| SONAG I LLC | CHK | 14027 | 2/1/2016 | $6,550 |
| SONAG I LLC | CHK | 14171 | 3/2/2016 | $6,550 |
| SONAG I LLC | CHK | 14266 | 4/1/2016 | $6,550 |
| SONAG I LLC | CHK | 14381 | 5/3/2016 | $7,500 |
| SONAG I LLC | CHK | 14476 | 6/1/2016 | $7,500 |
| SONAG I LLC | CHK | 14597 | 6/27/2016 | $1,500 |
| SONAG I LLC | CHK | 14628 | 7/1/2016 | $10,000 |
| | | | | **604,498** |

167. These rent payments were not made in the same dollar amount which was specified in the lease agreement between C3T and Sonag I, LLC.

168. A lease agreement between C3T and Sonag I, LLC dated April 1, 2006, was provided to the VA. The lease agreement indicates that C3T was to pay $400 per month for the first year of a five-year lease agreement, starting April 1, 2006, and through March 31, 2007. The monthly lease payment was to increase by $25 during each of the remaining four years of the lease period, with the final lease amount being $500 for the lease period April 1, 2010, through March 31, 2011.

169. Per the lease agreement, C3T was to have begun making rent payments to Sonag I in 2006. But, in fact, C3T did not begin making those lease payments until April 3, 2008 – or fully four years into the supposed lease period.

170. Four unsigned lease agreement amendments were located on L.M.'s computer. Those four unsigned lease agreements provided that C3T's rent was increased to $4,550 per month starting April 1, 2009, and then to $6,550 per month, starting October 1, 2012.

48

171. Per the lease agreement, and the unsigned amendments, the rent payments from C3T to Sonag I should have totaled, at most, $507,700 from April 3, 2008, to July 1, 2016.

172. But, in fact, during that period, C3T paid Sonag I $604,498.

173. The difference between: (a) the $604,498 sum that C3T paid to Sonag I characterized as rent between April 3, 2008, and July 1, 2016, and (b) the $507,700 conservative estimate of the amount due for that period under C3T's lease agreement with Sonag I and under the subsequent unsigned lease agreements, assuming that those unsigned agreements were given effect, was $96,798.

174. Thus, between April 3, 2008, and July 1, 2016, C3T paid Sonag I excess ostensible rent payments totaling at least **$96,798**.

175. Not only were the lease payments well in excess of the amounts that would have been due under C3T's written lease agreements with Sonag I, but those lease payments were made on dates inconsistent with when legitimate monthly lease payments would have been due under the lease agreements.

176. Both of these facts indicate that C3T's lease payments – and particularly the excess ostensible lease payments – were in fact financial transactions by which Ganos surreptitiously transferred criminal proceeds from C3T's bank accounts to Sonag I's bank accounts, which Ganos controlled.

**The $96,798 in Estimated Excess Rent Payments from C3T 5866 to the Sonag I 6975 and Ganos/Sonag I 2552 Accounts Included Criminal Proceeds C3T Received from Fraudulently Obtained Set-Aside Contracts**

177. C3T's excess ostensible rent payments to Sonag I, LLC were funded in material part by 8(a) fraud proceeds.

178.    As noted in the table in paragraph 145 above, for years 2008 through 2016, during which years C3T made "excess" ostensible rent payments to Sonag I, the approximate percentage of C3T's gross revenues consisting of revenues C3T had earned on SDVOSB set-aside contracts were:  87% (2008), 100% (2009), 100% (2010), 100% (2011), 89% (2012), 83% (2013), 88% (2014), 93% (2015), and 52% (2016).

179.    I have been advised by the Asset Forfeiture Coordinator for the U.S. Attorney's Office for the Eastern District of Wisconsin that because a substantial portion of C3T's revenues for each of these years consisted of proceeds of fraudulently obtained SDVOSB set-aside contracts, the government may lawfully infer under accepted tracing principles that an equally substantial portion of C3T's expenditures during each of these years were funded by proceeds of fraudulently obtained SDVOSB set-aside contracts. *See United States v. Banco Cafetero Panama*, 797 F.2d at 1159.

180.    I submit that, by the above excess rent payments, Ganos transferred criminal proceeds – consisting largely or wholly of profits that he had made through C3T via SDVOSB fraud – from the C3T 5866 operating account, to the Sonag I 6975 and Ganos/Sonag I 2552 accounts for the purpose of getting those SDVOSB fraud profits from C3T accounts to accounts that Ganos controlled in a surreptitious manner.

181.    Specifically, I submit that Ganos made these excess rent payments to transfer SDVOSB set-aside fraud proceeds he had obtained via C3T to Sonag Co. bank accounts in a manner intended to conceal, among other things:  (a) the nature of those proceeds, namely, that they were obtained via SDVOSB fraud; (b) the source of those proceeds, namely, that they came from SDVOSB contract payments made to C3T; (c) the location of those proceeds, in that Ganos' movement of the SDVOSB proceeds from C3T accounts and to Sonag accounts that

50

Ganos controlled helped to conceal the ultimate location of the proceeds that C3T had fraudulently obtained via SDVOSB contracts; and (d) the true ownership of those criminally derived proceeds, namely, that those proceeds and profits really belonged to Ganos as the orchestrator and prime beneficiary of the set-aside and money laundering conspiracies, and not to Sonag or others.

**The Excess Ostensible Rental Payments Made from Nuvo and C3T Proceeds to the Sonag I 6975 and Ganos/Sonag I 2552 Accounts Were Made as Part of a Money Laundering Conspiracy**

182.    The payments of $253,547 and $96,798 in set-aside fraud scheme proceeds and profits, from Nuvo and C3T accounts to the Sonag I 6975 and the Ganos/Song I 2552 accounts, via excess ostensible rent payments, constituted concealment money laundering transactions that were made as part of an overall money laundering conspiracy involving Ganos.  Ganos and his co-conspirators continued that money laundering conspiracy until at least July 2016.

183.    Under the SBA 8(a) program rules and the SDVOSB program rules, the qualified owners – here, supposedly J.L. and T.A. – were required to actually control Nuvo and C3T.  But, as detailed above, Ganos and his co-conspirators exercised true control over Nuvo and C3T from their fraudulent beginnings through at least August 2016.  Consequently, Nuvo and C3T were *never* eligible to obtain the set-aside contracts or the profits they earned on those set-aside contracts.

184.    Ganos entered into a money laundering conspiracy with L.M. and others with the object of using the Nuvo's and C3T's fraudulently obtained proceeds and profits for the benefit of Ganos, his companies, and his co-conspirators.  The conspiracy's purpose was to engage in financial transactions – including these excess ostensible rent payments from Nuvo and C3T to

accounts controlled by Sonag and Ganos – which were intended to conceal the nature, source, ownership, and location of the fraud proceeds.

185.     The manner and means of the conspiracy included the arranging of financial transactions – including these excess ostensible rent payments from Nuvo and C3T to accounts controlled by Sonag and Ganos – which were intended to move fraud proceeds from Nuvo and C3T to companies that Ganos controlled, including Sonag Company and Sonag I.  These transfers were designed to conceal that those funds included substantial amounts of fraud proceeds; that those proceeds consisted of amounts that Nuvo and C3T had fraudulently obtained via set-aside contracts; how Ganos and conspirators in fact controlled those fraud proceeds; and where those criminal proceeds ultimately ended up.

186.     The transfers, between April 3, 2008, and July 1, 2016, of approximately $253,547 and $96,798 from Nuvo and C3T to the Sonag I 6975 and the Ganos/Song I 2552 accounts were financial transactions conducted as a part of this money laundering conspiracy. By moving funds traceable to proceeds of the set-aside fraud scheme to an account in his own and Sonag I's name, Ganos concealed the true nature, source, ownership, and location of the funds, which were actually proceeds and profits obtained through Nuvo and C3T set-aside contracts.

187.     Through those concealment money laundering transactions, Ganos was able to move the criminal proceeds and access them for his own purposes without the funds appearing to have any connection to Nuvo or C3T, let alone the fraudulently obtained set-aside contracts that generated those profits.

188.     The Defendant Florist Avenue Property facilitated, and was therefore "involved in," the money laundering conspiracy in that the property provided a pretext for, and gave an air

52

of legitimacy to, Nuvo's and C3T's transfer of funds, including set-aside fraud proceeds, to accounts controlled by Sonag and Ganos. In short, the property helped Ganos disguise those transfers, which were funded in substantial part by criminal proceeds, as rent payments.

## Conclusion

189. Based on my training and experience, and the evidence I have received, and the information I have obtained, in the course of this investigation to date, I submit there exists probable cause to believe that the Defendant Florist Avenue Property:

> A. Facilitated, and was therefore involved in, concealment money laundering transactions and a concealment money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); and
>
> B. Is therefore subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) as having been "involved in" these money laundering offenses.

                    s/JENNIFER M. WALKOWSKI
                    Jennifer M. Walkowski
                    Special Agent
                    Federal Bureau of Investigation

Subscribed and sworn to before me
this 2nd day of April, 2018.

 s/SCOTT J. CAMPBELL
Notary Public, State of Wisconsin
My commission: is permanent .

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Place an "X" in the appropriate box: ☐ Green Bay Division ☒ Milwaukee Division

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott J. Campbell, AUSA
US Attorney's Office, #530 Federal Building
517 E. Wisconsin Avenue, Milwaukee, WI 53202 (414-297-1700)

## DEFENDANTS

Certain Real Property commonly known as 5500 (to include 5510)
West Florist Avenue, Milwaukee, Wisconsin
County of Residence of First Listed Defendant    Milwaukee
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*                              and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
    & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
    Student Loans
    (Excl. Veterans)
☐ 153 Recovery of Overpayment
    of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
    Liability
☐ 320 Assault, Libel &
    Slander
☐ 330 Federal Employers'
    Liability
☐ 340 Marine
☐ 345 Marine Product
    Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
    Product Liability
☐ 360 Other Personal
    Injury
☐ 362 Personal Injury -
    Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury -
    Product Liability
☐ 367 Health Care/
    Pharmaceutical
    Personal Injury
    Product Liability
☐ 368 Asbestos Personal
    Injury Product
    Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
    Property Damage
☐ 385 Property Damage
    Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
    Accommodations
☐ 445 Amer. w/Disabilities -
    Employment
☐ 446 Amer. w/Disabilities -
    Other
☐ 448 Education

### PRISONER PETITIONS
☐ 510 Motions to Vacate
    Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
    Conditions of
    Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure
    of Property 21 USC 881
☒ 690 Other

### LABOR
☐ 710 Fair Labor Standards
    Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
    Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc.
    Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus -
    Alien Detainee
    (Prisoner Petition)
☐ 465 Other Immigration
    Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
    28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
    or Defendant)
☐ 871 IRS—Third Party
    26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
    Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
    Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
    Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
    Act/Review or Appeal of
    Agency Decision
☐ 950 Constitutionality of
    State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding
☐ 2 Removed from
     State Court
☐ 3 Remanded from
     Appellate Court
☐ 4 Reinstated or
     Reopened
☐ 5 Transferred from
     another district
     *(specify)*
☐ 6 Multidistrict
     Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC § 981(a)(1)(A)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
    UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE    Lynn Adelman    DOCKET NUMBER    16CV1594,17CV208 & 1770

DATE
04/03/2018

SIGNATURE OF ATTORNEY OF RECORD
s/SCOTT J. CAMPBELL

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Case 2:18-cv-00519-LA   Filed 04/03/18   Page 1 of 1   Document 1-2